| |
|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1**<br>**PORZIO, BROMBERG & NEWMAN, P.C.**<br>100 Southgate Parkway<br>P.O. Box 1997<br>Morristown, New Jersey 07962<br>(973) 538-4006<br>(973) 538-5146 Facsimile<br>Warren J. Martin Jr., Esq.<br>Michael J. Naporano, Esq.<br>Kelly D. Curtin, Esq.<br>Rachel A. Parisi, Esq.<br>wjmartin@pbnlaw.com<br>mjnaporano@pbnlaw.com<br>kdcurtin@pbnlaw.com<br>raparisi@pbnlaw.com<br>*Proposed Counsel to Debtors* |

| | |
|---|---|
| In Re:<br><br>E Z MAILING SERVICES INC., *et al.*,[1]<br><br>Debtors. | Case No.: 16-10615<br><br>(Joint Administration Pending)<br><br>Chapter: 11<br><br>**Hearing Date and Time:**<br>**January \_\_\_\_\_, 2016, at \_\_\_:\_\_\_ \_\_.m.** |

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE APPROVING THE USE OF CASH COLLATERAL, PROVIDING ADEQUATE PROTECTION AND SETTING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

E Z Mailing Services Inc., *et al.*, (the "Debtors"), submit this memorandum of law in support of their motion (the "Motion") for entry of an interim order (the "Interim Order") pursuant to sections 361 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i)

---

[1] The Debtors in these Chapter 11 cases (joint administration pending) are (i) E Z Mailing Services, Inc. d/b/a E Z Worldwide Express and United Business Xpress, and (ii) United Business Freight Forwarders Limited Liability Company.

3258884

approving the use of cash collateral, (ii) providing adequate protection, and (iii) setting a final hearing pursuant to Rule 4001 of the Bankruptcy Rules. In support of the Motion, the Debtors respectfully represents as follows:

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 361 and 363 of the Bankruptcy Code and Rule 4001 of the Bankruptcy Rules.

## BACKGROUND

4.     On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "Court")

5.     The Debtors continue to operate their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made and, as of the date of the filing of the Motion, no official committees have been appointed or designated.

6.     A detailed description of the Debtors' business and the facts precipitating the filing of the Debtors' chapter 11 cases is set forth in the Affidavit of Ajay Aggarwal in Support of the Debtor's "First Day Motions" (the "Aggarwal Affidavit") filed concurrently herewith and incorporated by reference.

3258884

A. **The Debtors' Business**

7. The Debtors started as a small mail and packaging store in 1989 and grew to a national logistics and transportations company. The Debtors provide most of their courier services for the garment and apparel industry.

8. The Debtors' trucking network has spread from its original bases in Los Angeles and New York to most critical nerve centers of logistics in the United States.

9. Today, E Z Mailing Services Inc. operates through two divisions: the courier division operating under the d/b/a E Z Worldwide Express, and the trucking division operating under the d/b/a United Business Xpress. These divisions operate domestically and internationally in more than 200 countries, providing standard services for delivery of international small packages, domestic small packages, international freight, domestic freight and domestic trucking, and also tailoring services for more specific client needs. The Debtors are headquartered in Elizabeth, New Jersey, in close proximity to Newark airport.

10. As of January 10, 2016, the Debtors' had approximately seven-hundred (700) employees, the vast majority of whom work for the Debtors as delivery personnel.

11. The activities of co-Debtor, United Business Freight Forwarders, LLC ("UBFF"), are more limited than the activities of E Z Mailing Services Inc. UBFF has four (4) primary functions: (i) it processes payroll for the Debtors' Texas and Florida employees; (ii) it is a named guarantor of the indebtedness to PNC Bank, National Association, (iii) it is the obligor on certain equipment loans with Crossroads Equipment Lease & Finance, LLC and, (iv) notwithstanding the historical inactivity of co-Debtor UBFF, the Debtor's new contract with Amazon, described at paragraph 20 of the First Day Affidavit of Ajay Aggarwal, is being housed

and will be served out of UBFF. As a result, UBFF joins with EZ Mailing Services, Inc. in seeking relief under chapter 11 of the Bankruptcy Code.

### B. The PNC Bank, National Association Financing

*(i) The Line of Credit*

12. Pursuant to the terms of a Business Loan Agreement dated July 15, 2013, between the Debtors and PNC Bank, National Association (the "LOC Loan Agreement"), PNC Bank, National Association loaned money to the Debtors under a revolving line of credit (the "LOC Loan"), as evidenced by a Promissory Note dated July 15, 2013, executed by the Debtors in the principal amount of $1,500,000 (the "LOC Note"). The LOC Loan and all debts, liabilities, and obligations of the Debtors under the LOC Loan Agreement and LOC Note are referred to collectively as the "LOC Indebtedness".

13. PNC Bank, National Association alleges that the LOC Indebtedness, and all other debts, liabilities, and obligations of the Debtors to PNC Bank, National Association are secured by a Commercial Security Agreement dated July 15, 2013 (the "Security Agreement"), under which the Debtors granted to PNC Bank, National Association a security interest in and to the "Collateral" as that term is defined therein (the "Collateral"), which includes, without limitation, all assets of the Debtors of every kind and nature, whether presently existing or existing in the future, accounts, deposit accounts, documents, instruments, general intangibles, equipment, furniture, fixtures, and all proceeds of the foregoing.

14. PNC Bank, National Association alleges that it perfected its interest in the Collateral by filing a Uniform Commercial Code financing statement with the New Jersey Department of the Treasury on July 26, 2013, Filing No. 26410494.

3258884

15. As of the Petition Date, the total principal amount due under the LOC Loan is $1,500,000.

*(ii) The Term Loans*

16. PNC Equipment Finance, LLC ("PNC Equipment Finance") made term loans to the Debtors pursuant to the following, hereinafter the "Term Loan Notes":

> a) Term Note dated February 25, 2014 in the original principal amount of $431,934.57;
>
> b) Convertible Line of Credit Note dated March 28, 2014 and Notice of Conversion dated May 27, 2014 reflecting a principal balance of $567,744.84;
>
> c) Term Note in the original principal amount of $683,658.01 dated August 20, 2014;
>
> d) Term Note in the original principal amount of $606,449.62 dated August 26, 2014;
>
> e) Convertible Line of Credit Note in the original principal amount of $700,000 dated October 9, 2014 and Notice of Conversion dated November 3, 2014 reflecting a principal balance of $671,560.74;
>
> f) Term Note in the original principal amount of $323,980 dated March 25, 2015;
>
> g) Term Note in the original principal amount of $202,483.98 dated April 15, 2015;
>
> h) Convertible Line of Credit Note dated June 12, 2015 and Notice of Conversion dated July 22, 2015 reflecting a principal balance of $256,204.01.

17. The Term Loans and all debts, liabilities, and obligations of the Debtors under the Term Loan Notes are referred to collectively as the "Term Loan Indebtedness".

18. PNC Equipment Finance alleges that the Term Loan Indebtedness, and all other debts, liabilities, and obligations of the Debtors to PNC Equipment Finance, are secured by

Security Agreements executed by the Debtors dated February 25, 2014, May 23, 2014, August 20, 2014, August 26, 2014, November 18, 2014, March 25, 2015, April 15, 2015, and July 22, 2015 (collectively, the "Vehicle and Equipment Security Agreements"), under which the Debtors granted to PNC Equipment Finance security interests in and to the "Collateral" as that term is defined therein (collectively, the "Vehicle and Equipment Collateral"; hereinafter, the term "Collateral" includes the Vehicle and Equipment Collateral) which includes, without limitation, all of the vehicles described therein, all equipment described therein and on all schedules annexed thereto, and all proceeds of the foregoing.

19. PNC Equipment Finance alleges that it perfected its security interest in the Vehicle and Equipment Collateral by (a) with respect to titled vehicle collateral, taking possession of all certificates of title and/or noting its liens thereon, and (b) filing Uniform Commercial Code financing statements with the New Jersey Department of the Treasury as follows:

> Filing No. 50822881 filed May 5, 2014;
> Filing No. 50929131 filed August 22, 2014;
> Filing No. 50981663 filed October 20, 2014; and
> Filing No. 51188854 filed May 28, 2015.

20. As of the Petition Date, the total principal amount outstanding on the Term Loans is collectively $2,335,688.

*(iii) The Credit Card Loan*

21. PNC Bank, National Association made credit card loans to the Debtors (collectively, the "Credit Card Loan"; together with the LOC Loan and Term Loans, the "Loans") pursuant to the terms of a Visa Commercial Card Agreement dated July 17, 2013 between PNC Bank, National Association and the Debtors (the "Credit Card Agreement"). The

Credit Card Loan and all debts, liabilities, and obligations of the Debtors under the Credit Card Agreement are referred to collectively as the "Credit Card Indebtedness."

22. PNC Bank, National Association alleges that the Credit Card Indebtedness is secured by the Security Agreement and Vehicle and Equipment Security Agreements.

23. As of the Petition Date, the principal amount outstanding on the Credit Card Indebtedness totals $257,185.93.

24. In sum, PNC Bank, National Association has an alleged claim against the Debtors in the approximate principal amount of $2,000,000 pursuant to the LOC Loan and the Credit Card Loan, secured by all of the Debtors' assets. PNC Equipment Finance, LLC has an alleged claim against the Debtors in the approximate amount of $2,250,000 pursuant to the Term Loans, secured by certain vehicles and equipment.

*(iv) The Account and the Overdraft*

25. As of November 2015, the Debtors maintained business banking accounts with PNC Bank, National Association (the "PNC Accounts") bearing account #s ending in 9593 and 4923.

26. On or about November 18, 2015, the Debtors overdrew PNC Account #4923 by $1,200,000 (the "Overdraft"). As a result of the Overdraft, the regular November 21 payments due on two of the Term Loans (all of which electronically draw on PNC Account #4923) were declined for insufficient funds.

27. Immediately following the Overdraft, the Debtors cured each of the electronically missed payments on the PNC Loans. Over the ensuing 45 days, the Debtors also repaid nearly $1,000,000 of the Overdraft such that the amount due and owing on the Overdraft (allowing for

an offsetting positive account balance in PNC Account #9593 of $15,847.62), now stands at approximately $235,000.

28.    As a result of the Overdraft, however, by letter dated December 16, 2015, PNC Bank, National Association called a default on all the PNC Loans referenced above, accelerated and demanded immediate payment thereof in the collective outstanding amount of approximately $4.2 million.

29.    Further, by letter dated January 5, 2016, PNC Bank, National Association wrote to the Debtors' three largest customers advising of the default and directing the customers to make their payments directly to PNC Bank, National Association. This caused the Debtors' largest customer, Forever 21, to withhold from payment a $530,000 check needed for the Debtors' payroll.

### C. The Debtors' Immediate Need for Use of Cash Collateral

30.    The Debtors provide critical logistics services to retailers around the country. To enable the Debtors to continue fulfilling the needs of their clients so as to avoid a disruption of their clients' business operations and any potential impact on their clients' reputations in their respective industries, the Debtors require the use of cash collateral for the continuation of their operations without disruption. Most importantly, these funds are required immediately to fund the Debtors payroll.

31.    Annexed hereto as **Exhibit A** is a budget (the "Cash Collateral Budget") incorporating the Debtors anticipated income and expenses for the four (4) plus week period beginning with the stub week commencing on the Petition Date and ending January 17, 2016 and continuing through the week ending February 14, 2016. Without authorization to use cash

collateral in accordance with the Cash Collateral Budget, the Debtors operations will cease to the detriment of their employees, customers, and creditors.

32. Annexed hereto as **Exhibit B** is an equity cushion analysis, which reflects that the $4,468,840 face value of Debtors' accounts receivable as of January 12, 2016 exceeds the amounts owed to PNC Bank, National Association by $2,476,840. The only lender that may claim a lien on the Debtors' cash is PNC Bank, National Association  As demonstrated by **Exhibit B**, however, the value of PNC Bank, National Association's collateral far exceeds the indebtedness.

## RELIEF REQUESTED

33. By the Motion, Debtors request an order: (i) authorizing the use of PNC Bank, National Association's cash collateral pursuant to the Budget attached hereto as **Exhibit A**; (ii) granting PNC Bank, National Association adequate protection in the form of replacement liens pursuant to sections 361 and 363 of the Bankruptcy Code, to the extent PNC Bank National Association's cash collateral is used and to the extent of any diminution in the value of PNC Bank, National Association's collateral, with the same priority in the Debtors' post-petition collateral, and proceeds thereof, that PNC Bank, National Association held in the Debtors' prepetition collateral; and (iii) giving notice of and scheduling an interim and final hearing pursuant to Bankruptcy Rule 4001.

34. Specifically, the Debtors request that the Order include authorization for the Debtors' customers to disregard PNC Bank, National Association's effort at levying on the Debtors' accounts receivable and directing those customers to resume making their regular payments for services rendered by the Debtors to the Debtors.

3258884

35. Without the immediate use of cash collateral, Debtors will be unable to pay ordinary and necessary business expenses including, but not limited to, payroll and related obligations, utilities, amounts owed to vendors and other suppliers of goods and services, insurance, and other costs of administering the estates. The use of cash collateral as requested herein is therefore critical to preserving the value of the Debtors' estates for all parties-in-interest.

## BASIS FOR RELIEF

36. The Bankruptcy Code provides chapter 11 debtors-in-possession with the right to use cash collateral to operate their businesses upon satisfaction of certain prerequisite(s). Pursuant to section 363(c)(2) of the Bankruptcy Code:

> The trustee [or debtor-in-possession] may not use, sell, or lease cash collateral under paragraph 1 of this subsection, unless - (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

37. The "provisions of this section" referred to in section 363(c)(2)(B) quoted above includes section 363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e). That is, to the extent necessary, adequate protection is to be provided to a party with an interest in property sought to be used by a debtor to balance a debtor's required use of cash collateral and the rights of parties holding an interest in that cash collateral.

3258884

38. While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by case basis. *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Swedeland Dcv. Grp.*, Inc., 16 F.3d 552, 564 (3d Cir. 1994); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *see also In re Mosello,* 195 BR. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy § 361.01[1] at 361-66 (15th ed. 1993)) (explaining that what constitutes adequate protection is not defined, and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

39. Regardless of the form of adequate protection given, "the entitlement to and measure of adequate protection is always determined by the extent of the anticipated or actual decrease in the value of the secured creditor's collateral during the bankruptcy case." *In re Gallegos Research Grp., Corp.,* 193 B.R. 577, 584 (Bankr. D. Colo. 1995). Although section 361 of the Bankruptcy Code sets forth three non-exclusive methods of how an interest in property may be adequately protected, "adequate protection" is not defined in the Bankruptcy Code. *Swedeland,* 16 F.2d at 564; *In re Shriver,* 33 B.R. 176, 181 (Bankr. N.D. Ohio 1983).

40. Pursuant to section 361 of the Bankruptcy Code, a debtor may provide adequate protection by providing it with a replacement lien. A secured lender is only entitled to adequate protection up to the value of the collateral supporting its secured claim; it is not entitled to adequate protection for lost opportunity costs. *Gallegos Research Group.*, 193 B.R. at 584-85 (citing *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365 (1988)); *Cann & Saul Steel Co.*, 76 B.R. 479, 483 (Bankr. E. D. Pa. 1987).

41. The best way to ensure that PNC Bank, National Association's security interests are not jeopardized is through the use of its cash collateral. Through the use of cash collateral, the Debtors will be able to maintain their operations as a going concern post-petition while protecting and preserving the value of the their collateral. To ensure the availability of the Debtors' cash collateral, the Debtors' customers must be authorized and directed to make payments of their regular payables to the Debtors, irrespective of the letters received from PNC Bank, National Association prepetition insofar as the Debtors' receivables are property of these chapter 11 bankruptcy estates, and PNC Bank, National Association's efforts to possess and/or control property of the estate post-petition would constitute a violation of the automatic stay under section 362 of the Bankruptcy Code.

42. To adequately protect PNC Bank, National Association's interests during the period of the Cash Collateral Budget, the Debtors propose in their Interim Order to grant PNC Bank, National Association adequate protection in the form of replacement liens pursuant to sections 361 and 363 of the Bankruptcy Code, to the extent PNC Bank, National Association's cash collateral is used and to the extent of any diminution in the value of PNC Bank, National Association's collateral, with the same priority in the Debtors post-petition collateral, and proceeds thereof, that PNC Bank, National Association held in the Debtors' prepetition collateral. Courts have consistently held that replacement liens are sufficient adequate protection. *See In re Mt. Olive Hospitality, LLC*, 2014 WL 1309953, at *3, n. 6 (D.N.J. March 31, 2014); *see also In re Airport Inn Assocs., Ltd.*, 132 B.R. 951, 960 (Bankr. D. Col. 1990) ("The court could order a lien in post-petition accounts receivable as adequate protection if that relief was requested . . . ."); *In re Int'l Design & Display Grp., Inc.*, 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993) (court authorized debtor to use cash collateral and, as adequate protection,

3258884

granted secured creditor replacement lien on all post-petition accounts receivable, inventory and contracts to the extent the creditor's collateral was depleted).

43. No further adequate protection is necessary for PNC Bank, National Association, as explained in **Exhibit B** hereto, the equity cushion analysis. The only lender that may claim a lien on the Debtors' cash is PNC Bank, National Association. Indeed, as described above, the Term Loans with lender PNC Equipment Finance, unlike the LOC Loan and the Credit Card Loan, are not secured by the Debtors' receivables. Therefore, because the value of PNC Bank, National Association's collateral—$4,468,840 of the Debtors' accounts receivables—far exceeds the indebtedness owed to PNC Bank, National Association—$1,992,000—PNC Bank, National Association is adequately protected via the replacement lien sought by the Motion. The Debtors expect to maintain at least a $4,000,000 accounts receivable level throughout the initial cash collateral period. The Debtors will keep PNC Bank, National Association apprised of any changes in the value of PNC Bank, National Association's collateral through bi-weekly accountings setting forth the cash receipts and disbursements made by the Debtors under the Interim Order.

44. Through the use of cash collateral, the Debtors anticipate that they will be able to maintain and enhance the value of their assets for the benefit of PNC Bank, National Association, other creditors, and the estates. Thus, the best way to ensure that PNC Bank, National Association's security interests are not jeopardized is through the use of their cash collateral. *See In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized."). The Debtors

respectfully submit that the protections proposed herein are appropriate to adequately protect PNC Bank, National Association's interests.

## NOTICE

45. By separate application filed simultaneously herewith, the Debtors have requested that the Court shorten the notice period and grant an expedited interim hearing on this Motion and other "first day motions" so that the Debtors have sufficient funds to continue operations.

46. Pursuant to Bankruptcy Rule 4001, the Debtors respectfully request it be authorized to provide notice of the Interim Hearing and the Final Hearing on the Motion by serving a copy of the Motion, together with a copy of the Interim Order by hand, overnight mail, first class mail, facsimile or, to the extent previously agreed by the party to be served, by electronic mail, upon (i) the Office of the United States Trustee for the District of New Jersey, One Newark Center, Suite 2100, Newark, NJ 07102; (ii) counsel for PNC Bank, National Association, c/o McCarter & English (Attn: Lisa Bonsall, Esq.), Four Gateway Center, 100 Mulberry St., Newark, NJ 07102; (iii) Secured Creditors; (iv) the Internal Revenue Service, 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016 (overnight mail address); (v) the New Jersey Division of Taxation Compliance and Enforcement Bankruptcy Unit, 50 Barrack Street, 9th Floor, Trenton, NJ 08695; (vi) the Office of the Attorney General of the State of New Jersey, Division of Law, Richard J. Hughes Justice Complex, 25 Market Street, Trenton, NJ 08625; (vii) the Office of the United States Attorney, Peter Rodino Federal Building, 970 Broad Street, Suite 700, Newark, NJ 07102; (viii) the United States Attorney General, United States Department of Justice, Ben Franklin Station, P.O. Box 683, Washington, DC 20044; (ix) the Debtors' twenty largest unsecured creditors; and (x) those parties who have filed a notice of appearance and request for service of pleadings in this Chapter 11 case pursuant to Fed. R.

Bankr. P. 2002. The Debtors believe that such notice to such parties is reasonably calculated to inform creditors regarding the emergency relief that is being requested and is sufficient under the circumstances.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request entry of the accompanying Interim Order in the form annexed hereto, and for such other and further relief as is just and proper.

Dated: January 13, 2016                              Respectfully submitted,

**PORZIO, BROMBERG & NEWMAN, P.C.**
*Proposed Counsel to the Debtors*


By: */s/Warren J. Martin Jr.*
         Warren J. Martin Jr.

3258884

# EXHIBIT A

**EZ Mailing Services Inc.**
**4 Week Cash Flow Projection**
**Bankruptcy Case No.: 16-10615**

| | PROJ. 1 W/E 01/17/16 | PROJ. 2 W/E 01/24/16 | PROJ. 3 W/E 01/31/16 | PROJ. 4 W/E 02/07/16 | Proj. 5 W/E 02/14/16 | PROJ. Total 4 weeks ending 02/14/16 |
|---|---:|---:|---:|---:|---:|---:|
| **Cash Receipts:** | | | | | | |
| AR Collections | $ 205,000 | $ 2,008,000 | $ 1,113,000 | $ 1,008,000 | $ 995,000 | $ 5,329,000 |
| **Disbursements:** | | | | | | |
| **Cost of Operations:** | | | | | | |
| Freight | 52,000 | 460,000 | 240,000 | 290,000 | 260,000 | 1,302,000 |
| Payroll and payroll taxes | | 498,300 | 259,500 | 498,300 | 259,500 | 1,515,600 |
| Contract Labor | 50,000 | 55,000 | 55,000 | 65,000 | 50,000 | 275,000 |
| Rent | | 135,000 | | 180,700 | 76,700 | 392,400 |
| Fuel | 30,000 | 210,000 | 170,000 | 30,000 | 170,000 | 610,000 |
| CRO Contract | 1,500 | 6,250 | 6,250 | 6,250 | 6,250 | 26,500 |
| Custom Clearance | 8,000 | | 8,000 | - | 8,000 | 24,000 |
| Truck Repairs | 8,000 | 22,500 | 20,000 | 20,000 | 20,000 | 90,500 |
| Parking Tolls et al | | 60,000 | | 60,000 | | 120,000 |
| Repairs and Maintenance | | | 5,000 | | 5,000 | 10,000 |
| Uniform and Supplies | | | 28,500 | | | 28,500 |
| Other | | 21,000 | 15,000 | 15,000 | 15,000 | 66,000 |
| Consulting | | 25,000 | | 25,000 | | 50,000 |
| Health and Life Insurance | | 27,000 | | | | 27,000 |
| Insurance | | 324,000 | | | | 324,000 |
| Office | | | 34,500 | | 20,000 | 54,500 |
| Telephone | | | 15,000 | | 15,000 | 30,000 |
| Utilities | | 30,000 | | 25,000 | | 55,000 |
| Office Equipment Leases | | | 1,000 | | 1,000 | 2,000 |
| Advertising and commissions | | | 1,000 | | 1,000 | 2,000 |
| Travel | | | | 4,400 | | 4,400 |
| Utility Deposit | | 20,755 | | | | 20,755 |
| Debtor Professional Fees | - | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 |
| **Total cash disbursements** | 149,500 | 1,944,805 | 908,750 | 1,269,650 | 957,450 | 5,230,155 |
| Net cash flow | 55,500 | 63,195 | 204,250 | (261,650) | 37,550 | 98,845 |
| Cash, beginning of period | 18,650 | 74,150 | 137,345 | 341,595 | 79,945 | 18,650 |
| Cash, end of period | $ 74,150 | $ 137,345 | $ 341,595 | $ 79,945 | $ 117,495 | $ 117,495 |

**Footnotes:**

The w/e 1/17/2016 is the stub week from the petition date through Sunday January 17, 2016

Actual disbursements for any individual expense category may be over the budgeted amount by up to 10% so long as the overall expenditures remain within budgeted projections.

Debtor professional fees shall be paid each week into a designated account and later released to professionals following court approval.

# EXHIBIT B

**EZ Mailing Services, Inc**
**Bankruptcy Case No.:  16-10615**
**PNC**
**Use of Cash Collateral Equity**
**Cushion Analysis**

| | |
|---|---:|
| Face Value of Debtors' Accounts Receivable at January 12, 2016 | $4,468,840 |
| Less: | |
|     PNC Line of Credit | (1,500,000) |
|     PNC Operating Account Overdraft | (235,000) |
|     PNC Credit Card Debt | (257,000) |
| Net Equity Cushion | $2,476,840 |

**Footnote:**

The accounts receivable balance was obtained from the Debtors' books and records.  Highlights include:

Balances due from approximately 500 customers with approximately 65%, or 2.875 million, of the accounts receivable due from 3 customers including:

| | |
|---|---:|
| Forever 21 | 1,591,000 |
| H&M | 652,000 |
| Disney | 632,000 |
| | 2,875,000 |

The liability balances confirmed with Debtors management