UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**Caption in Compliance with D.N.J. LBR 9004-1**

**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
(973) 538-4006
(973) 538-5146 Facsimile
Warren J. Martin Jr., Esq.
Michael J. Naporano, Esq.
Kelly D. Curtin, Esq.
Rachel A. Parisi, Esq.
wjmartin@pbnlaw.com
mjnaporano@pbnlaw.com
kdcurtin@pbnlaw.com
raparisi@pbnlaw.com
*Proposed Counsel to Debtors*

In Re:

E Z MAILING SERVICES INC., *et al.*,[1]

                  Debtors.

Case No.: 16-10615

(Joint Administration Pending)

Chapter: 11

**Hearing Date and Time:**
**January _____, 2016, at ___:___ __.m.**

**AFFIDAVIT OF AJAY AGGARWAL IN SUPPORT OF DEBTORS'
CHAPTER 11 PETITION AND "FIRST DAY MOTIONS"**

STATE OF NEW JERSEY   )
                          ) SS.
COUNTY OF HUDSON     )

AJAY AGGARWAL, of full age, being duly sworn according to law, upon his oath, deposes and states:

1.    I am the President of E Z Mailing Services, Inc., *et al*. ("E Z Mailing") (hereinafter the "Debtors").  The Debtors maintain their corporate offices at 669 Division Street, Elizabeth, New Jersey. I have served in that role since its formation in 1989.  I am fully familiar

---

[1] The Debtors in these Chapter 11 cases (joint administration pending) are (i) E Z Mailing Services, Inc. d/b/a E Z Worldwide Express and United Business Xpress, and (ii) United Business Freight Forwarders Limited Liability Company.

with the Debtors' business affairs and day-to-day operations, and am duly authorized to make this affidavit on the Debtors' behalf.[2]   I submit this affidavit (a) in support of the Debtors' petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), (b) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these chapter 11 cases, and (c) to provide general information about the Debtors' business operations that are germane to the Debtors' "First Day Motions." I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and furtherance of their restructuring efforts.

2.      Part I of this Affidavit provides an introduction to the Debtors and their chapter 11 cases, including the Debtors' intentions for reorganizing and emerging from chapter 11.  Part II provides the history of the Debtors' businesses. Part III lays out the Debtors' capital structure and relationships with their lenders. Part IV describes the specific events leading to the bankruptcy filings, and Part V sets forth a brief summary of the First Day Motions.

## I.     <u>INTRODUCTION</u>

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtors filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey (the "<u>Court</u>")

4.      The Debtors continue to operate their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made and, as of the date of the filing of this Affidavit, no official committees have been appointed or designated.

---

[2] The factual statements in this affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents, and my experience and knowledge of the Debtors' operations and financial condition.

3260220

5.      The primary, if not exclusive, motivator of these chapter 11 proceedings, is the

Debtors' deteriorated relationship with their primary secured lender, PNC Bank.[3]  The Debtors

maintain banking and or creditor/debtor relationships with Wells Fargo, Provident Bank, New

York Community Bank, PNC Bank, Mercedes Benz Finance, Crossroads Equipment Lease &

Finance, LLC, Element, Scottrade Bank, TFC Finance, Hitachi Capital America Corp., Toyota

Industries Commercial Finance, Inc., Volvo Finance and GE Capital.

6.      With the singular exception of PNC Bank, each of the Debtors' lending

relationships is current and performing as of the Petition Date.  As a result of an isolated, albeit

large ($1.2 million) overdraft that took place on November 16, 2015, PNC Bank has put the

Debtors in a position wherein if authority to use cash collateral is not granted immediately,

seven-hundred (700) employees, primarily hourly employees who count on their bi-weekly

paycheck, will lose their jobs.

7.      The Debtors are retaining Bederson, LLP as crisis managers with Ed Bond

serving as Chief Restructuring Officer ("CRO") to oversee the Debtors' finances and to ensure,

among a number of other tasks, that  no future overdrafts occur.  The retention of Bederson and

Mr. Bond as Chief Restructuring Officer is of course subject to the *Harnischfeger Safety- Kleen*

Protocol and Court approval.

8.      The Debtors intend to reorganize by refinancing the PNC Bank debt and/or by

paying to PNC Bank the indubitable equivalent of its secured claim.

9.      The Debtors have filed the following First Day Motions along with this First Day

Affidavit, for which Debtors respectfully request this Court's expedited consideration:

      a)   Application for Expedited Consideration of First Day Matters (the
           "Expedited Motion");

---

[3] Unless otherwise noted herein, "PNC Bank" shall refer to PNC Bank, National Association and its affiliated
entities.

3260220

b) Debtors' Motion for Entry of Interim and Final Orders Under Sections 361 and 363 of the Bankruptcy Code Approving the Use of Cash Collateral, Providing Adequate Protection and Setting a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "<u>Cash Collateral Motion</u>");

c) Debtors' Motion For Entry Of An Order Authorizing The Debtors To Maintain Current Bank Accounts, Maintain Prepetition Cash Management System, Use Existing Business Forms, And Granting A Waiver Of The Deposit Guidelines Set Forth In Section 345 Of The Bankruptcy Code (the "<u>Bank Account Motion</u>");

d) Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(A) and 507(A)(4) (I) Authorizing But Not Directing The Debtors To Pay Prepetition Wages, Salaries, Compensation, Benefits and Reimbursable Business Expenses and Related Costs, and (II) Directing All Banks To Honor Checks For Payment Of Employee Obligations (the "<u>Wage Motion</u>");

e) Motion for Entry of an Order (i) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (ii) Granting Related Relief (the "<u>Critical Vendor Motion</u>");

f) Debtors' Motion for Entry of Interim and Final Orders (i) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (ii) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366 (the "<u>Utilities Motion</u>");

g) Debtors' Motion for Entry of an Order Extending Their Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs Pursuant to Fed. R. Bankr. P. 1007(c) (the "<u>Schedules Motion</u>");

h) Debtors' Motion For An Order Directing Joint Administration Of The Debtors' Chapter 11 Cases (the "<u>Joint Administration Motion</u>"); and

i) Application for Retention of Professional Porzio, Bromberg & Newman, P.C. (the "<u>Porzio Motion</u>").

Each of the First Day Motions are described in Part V below.

4

## II.    HISTORY OF THE DEBTORS' BUSINESSES

10.    In 1989, my brother, Vijay Aggarwal, and I opened a single location retail store in Jersey City, New Jersey known as "E Z Mailing." The store, following the model of a "Mailboxes, Etc." store, provided consumers with mail and packaging services for shipping packages via UPS, FedEx, or US Mail.  That corporate entity, formed in 1989 and owned 50% by me and 50% by my brother, is the same entity that has grown into the current $50,000,000/year transportation logistics company operating under two d/b/a's: our courier division under the d/b/a E Z Worldwide Express and our trucking division under the d/b/a United Business Xpress.

11.    The historical activities of co-Debtor, United Business Freight Forwarders, LLC ("UBFF"), have been more limited than Debtor EZ Mailing. UBFF has four (4) primary functions: (i) it processes payroll for the Debtors' Texas and Florida employees;  (ii) it is a named guarantor of the indebtedness to PNC Bank, National Association, (iii) it is the obligor on certain equipment loans with Crossroads Equipment Lease & Finance, LLC and, (iv) notwithstanding the historical inactivity of co-Debtor UBFF, the Debtor's new contract with Amazon, described at paragraph 20 of this First Day Affidavit, is being housed and will be served out of UBFF.  Work under that contract begins next week.

12.    As of January 10, 2016, the Debtors had approximately seven-hundred (700) employees, the vast majority of whom work for the Debtors as delivery personnel.

13.    In 1993, we began making physical delivery of packages to New York City's garment district.

14.    We formed relationships within the garment and apparel industry and began

5

picking up business from various private label garment manufacturers. Sales increased through the mid-1990s to $8 or $9 million annually.  We became the "go to" carrier for LTL Delivery (less than a truckload, generally one or two pallets) from private label garment manufacturers to retail stores such Macy's, Walmart, JC Penny and the like.

15.     We opened hubs in New York and Los Angeles to serve our customers' needs.

16.     In 2008, we began a business relationship with garment industry retailer, Forever 21. Initially, Forever 21 hired us to make deliveries to three of its stores located in New York City.  After 6 months, they gave us additional business, and then more still over the years such that, by 2015, we were Forever 21's exclusive delivery service for 150 of its stores nationwide. The Debtors' total annual revenues now stand at $50,000,000, with Forever 21 representing 50% to 60% of the business.

17.     The years 2012 and 2013 were the Debtors' best, but by 2014, we had recognized both the danger of being too heavily dependent on Forever 21, and the opportunity for diversification that the Forever 21 relationship had provided  us with.  Our expansion over the years to meet Forever 21's requirements also gave us a serious national presence with hubs, offices and drivers in eleven (11) states, including New York, New Jersey, California, Washington, Illinois, Massachusetts, Virginia, Georgia, Tennessee, Texas and Florida.

18.     Thus, in 2014 and 2015 we begin investing in trucks and hubs and the development of new customers.  Based on our 2012 and 2013 performance, PNC Bank and others stood ready and willing to provide financing to assist us in doing so. In 2015, our diversification efforts brought us two new important customers: The Disney Store (because of our Florida/Georgia Hub) and H&M Stores.  Already, these two customers aggregate about $13 million per year in business.

6

3260220

19.     We have also just been awarded a contract with Clare's, a footwear company, and are very close to finalizing a contract with another very large national retailer that is a household name.

20.     Additionally, we've signed a contract with Amazon, and now will deliver directly from an Amazon distribution center to the consumer. The Amazon contract is a small "test" contract, just $250,000 in value, and covers a selected 30 square mile area in California. Our drivers are training now for this project, which goes live one week from today, on January 20, with our first invoice to be issued January 27.  Under this Amazon contract, we are providing five trucks that operate ten hours per day, seven days per week.  If this project proves to be profitable both for the Debtors and for Amazon, there are tremendous growth prospects here.

### III.     Capital Structure/PNC Bank Relationship

#### A.  Lenders other than PNC Bank

21.     The Debtors' maintain multiple equipment loans covering most of their 250 trucks, trailers, and related equipment with nine (9) lenders, as follows:

    a)  Mercedes Benz Finance;

    b)  Crossroads Equipment Lease & Finance, LLC;

    c)  Element;

    d)  Scottrade Bank;

    e)  TFC Finance;

    f)  Hitachi Capital America Corp.;

    g)  Toyota Industries Commercial Finance, Inc.;

    h)  Volvo Financial Svc;

    i)  GE Capital.

7

3260220

22.     As of the Petition Date, none of these loans are in default; each has been paid according to terms.

**B.  The PNC Bank Financing**

     *i.   The Line of Credit*

23.     Pursuant to the terms of a Business Loan Agreement dated July 15, 2013, between the Debtors and PNC Bank, National Association (the "<u>LOC Loan Agreement</u>"), PNC Bank, National Association loaned money to the Debtors under a revolving line of credit (the "<u>LOC Loan</u>"), as evidenced by a Promissory Note dated July 15, 2013, executed by the Debtors in the principal amount of $1,500,000 (the "<u>LOC Note</u>").  The LOC Loan and all debts, liabilities, and obligations of the Debtors under the LOC Loan Agreement and LOC Note are referred to collectively as the "LOC Indebtedness".

24.     PNC Bank, National Association alleges that the LOC Indebtedness, and all other debts, liabilities, and obligations of the Debtors to PNC Bank, National Association are secured by a Commercial Security Agreement dated July 15, 2013 (the "<u>Security Agreement</u>"), under which the Debtors granted to PNC Bank, National Association a security interest in and to the "Collateral" as that term is defined therein (the "<u>Collateral</u>"), which includes, without limitation, all assets of the Debtors of every kind and nature, whether presently existing or existing in the future, accounts, deposit accounts, documents, instruments, general intangibles, equipment, furniture, fixtures, and all proceeds of the foregoing.

25.     PNC Bank, National Association alleges that it perfected its interest in the Collateral by filing a Uniform Commercial Code financing statement with the New Jersey Department of the Treasury on July 26, 2013, Filing No. 26410494.

8

26.     As of the Petition Date, the total principal amount due under the LOC loan is

$1,500,000.

     ii.   *The Term Loans*

27.     PNC Equipment Finance, LLC ("PNC Equipment Finance") made term loans to

the Debtors pursuant to the following, hereinafter the "Term Loan Notes":

> a) Term Note dated February 25, 2014 in the original
>    principal amount of $431,934.57;
>
> b) Convertible Line of Credit Note dated March 28, 2014
>    and Notice of Conversion dated May 27, 2014 reflecting
>    a principal balance of $567,744.84;
>
> c) Term Note in the original principal amount of
>    $683,658.01 dated August 20, 2014;
>
> d) Term Note in the original principal amount of
>    $606,449.62 dated August 26, 2014;
>
> e) Convertible Line of Credit Note in the original principal
>    amount of $700,000 dated October 9, 2014 and Notice of
>    Conversion dated November 3, 2014 reflecting a
>    principal balance of $671,560.74;
>
> f) Term Note in the original principal amount of $323,980
>    dated March 25, 2015;
>
> g) Term Note in the original principal amount of
>    $202,483.98 dated April 15, 2015;
>
> h) Convertible Line of Credit Note dated June 12, 2015 and
>    Notice of Conversion dated July 22, 2015 reflecting a
>    principal balance of $256,204.01.

28.     The Term Loans and all debts, liabilities, and obligations of the Debtors under the

Term Loan Notes are referred to collectively as the "Term Loan Indebtedness".

29.     PNC Equipment Finance alleges that the Term Loan Indebtedness, and all other

debts, liabilities, and obligations of the Debtors to PNC Equipment Finance, are secured by

Security Agreements executed by the Debtors dated February 25, 2014, May 23, 2014, August 20, 2014, August 26, 2014, November 18, 2014, March 25, 2015, April 15, 2015, and July 22, 2015 (collectively, the "Vehicle and Equipment Security Agreements"), under which the Debtors granted to PNC Equipment Finance security interests in and to the "Collateral" as that term is defined therein (collectively, the "Vehicle and Equipment Collateral"; hereinafter, the term "Collateral" includes the Vehicle and Equipment Collateral) which includes, without limitation, all of the vehicles described therein, all equipment described therein and on all schedules annexed thereto, and all proceeds of the foregoing.

30.    PNC Equipment Finance alleges that it perfected its security interest in the Vehicle and Equipment Collateral by (a) with respect to titled vehicle collateral, taking possession of all certificates of title and/or noting its liens thereon, and (b) filing Uniform Commercial Code financing statements with the New Jersey Department of the Treasury as follows:

> Filing No. 50822881 filed May 5, 2014;
> Filing No. 50929131 filed August 22, 2014;
> Filing No. 50981663 filed October 20, 2014; and
> Filing No. 51188854 filed May 28, 2015.

31.    As of the Petition Date, the total principal amount outstanding on the Term Loans is collectively $2,335,688.

### iii. The Credit Card Loan

32.    PNC Bank, National Association made credit card loans to the Debtors (collectively, the "Credit Card Loan"; together with the LOC Loan and Term Loans, the "Loans") pursuant to the terms of a Visa Commercial Card Agreement dated July 17, 2013 between PNC Bank, National Association and the Debtors (the "Credit Card Agreement").  The Credit Card Loan and all debts, liabilities, and obligations of the Debtors under the Credit Card

3260220

Agreement are referred to collectively as the "Credit Card Indebtedness."

33.    PNC Bank, National Association alleges that the Credit Card Indebtedness is secured by the Security Agreement and Vehicle and Equipment Security Agreements.

34.    As of the Petition Date, the principal amount outstanding on the Credit Card Indebtedness totals $257,185.93.

### iv. The Account and the Overdraft

35.    As of November 2015, the Debtors maintained business banking accounts with PNC Bank, National Association (the "PNC Accounts") bearing account #s ending in 9593 and 4923.

36.    On or about November 18, 2015, the Debtors overdrew PNC Account #4923 by $1,200,000 (the "Overdraft").   As a result of the Overdraft, the regular November 21 payments due on some of the Term Loans, all of which electronically draw on PNC Account #4923, were declined for insufficient funds.

37.    Immediately following the Overdraft, the Debtors cured each of the electronically missed payments on the PNC Loans.  Over the ensuing 45 days, the Debtors also repaid nearly $1,000,000 of the Overdraft such that the amount due and owing on the Overdraft (allowing for an offsetting positive account balance in PNC Account #9593 of $15,847.62), now stands at approximately $235,000.

38.    As a result of the Overdraft, however, by letters dated December 16, 2015, PNC Bank, National Association as well as PNC Equipment Finance called a default on all the PNC Loans referenced above, accelerated and demanded immediate payment thereof in the collective outstanding amount of approximately $4.2 million.

## IV.    Reasons for the Bankruptcy Filing

11

39.     Each year, 40% of our annual revenues come in the fourth quarter, primarily due to the holiday retail season.  In the latter half of 2014 and through 2015, to finance the growth described above, the Debtors added $12 million in trucks and hubs.  In addition to the Debtors' institutional financing described above, my brother and I also loaned $7,235,008.67 to the Debtors.  Against this financed growth, we anticipated a 2015 holiday season that would match historical results.

40.     Unfortunately, however, the 2015 holiday season fell far short of expectations.  Although the retail industry in general had a satisfactory season, the balance between in-store retail sales and online sales tipped dramatically towards online sales and direct consumer delivery.  Since our businesses serve primarily in-store retail sales, we suffered accordingly.  Caught between the over-leveraging that resulted from our fast growth, and our abysmal 2015 holiday season, the Debtors lived from hand to mouth during the fourth quarter of 2015.

41.     After the Overdraft, and PNC Bank's default and acceleration notices, PNC Bank and the Debtors entered into negotiations for a 90-day forbearance, in order to permit the Debtors to find another banking relationship.  However, while these negotiations were ongoing, PNC Bank sent to Forever 21 as well as the Debtors' second and third largest customers a "Notice of Payment Instructions" letter purportedly directing each customer to pay all sums due to PNC Bank rather than to the Debtors.  A copy of this letter is annexed hereto as **Exhibit "A."** As a result of these letters, Forever 21 held up a $530,000 weekly payable that was scheduled to be made to the Debtors on Thursday, January 7, 2015.  Weekly payments from Forever 21 in the neighborhood of $400,000 to $600,000 are consistently relied upon by the Debtors for making payroll as well as critical vendor payments.  Currently, the Forever 21 receivable stands at approximately $1.6 million, but because of PNC Bank's letter, Forever 21 was not comfortable

12

releasing any of it prior to a bankruptcy filing. The detail on the Debtors' Forever 21 receivable is annexed hereto as **Exhibit "B."**

42.     The Debtors were prepared to make the final $230,000 payment necessary to clear the PNC Overdraft on Friday, January 8, 2016 out of the January 7, 2016 weekly payment coming in from Forever 21.   Counsel committed this to PNC Bank in correspondence dated December 30, 2015. However, PNC Bank's **Exhibit "A"** letter to Forever 21, caused Forever 21 to freeze that payment, thereby jeopardizing the Debtors' payroll,  as well as the final payment necessary to cure the Overdraft. Following a phone call on January 7, 2016 during which PNC Bank steadfastly refused to release the Forever 21 funds to enable the Debtors to make last week's payroll, on Friday, January 8, 2016, my brother advanced yet another $250,000 into the company, for the purpose of covering what otherwise would have been a payroll shortage on the payroll being made that day.

43.     As a result, it became necessary to file this bankruptcy proceeding in order to continue to receive and utilize our receivables from our customers, as we have historically. Those collections are necessary to enable the Debtors to meet their obligations, including making payroll to our approximately seven-hundred (700) employees, most of whom are paid hourly and require their paychecks to meet their own necessary living expenses.

## V.   Summary of First Day Motions

### A.  The Expedited Motion

44.     The Debtors seek expedited consideration of the First Day Motions.

### B.  The Joint Administration Motion

45.     The Debtors seek the joint administration of these chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket

3260220

for all of the jointly-administered cases.  The Debtors propose to designate the chapter 11 case of

E Z Mailing Services Inc., as the main bankruptcy case.  Joint administration will obviate the

need for duplicative notices, motions, and orders, and thereby save considerable time and expense

for the Debtors and their estates.

### C.  The Cash Collateral Motion

46.    The Debtors provide critical logistics services to retailers around the country and

internationally.  To enable the Debtors to continue fulfilling the needs of their clients so as to

avoid a disruption of their clients' business operations and any potential impact on their clients'

reputations in their respective industries, the Debtors require the use of cash collateral for the

continuation of their operations without disruption.  Most importantly, these funds are required

immediately to fund the Debtors' payroll.  Annexed to the Cash Collateral Motion as Exhibit A is

a budget (the "Cash Collateral Budget") incorporating the Debtors' anticipated income and

expenses for the four (4) week period beginning with the week ending January 17, 2016 and

continuing to the week ending February 14, 2016.

47.    By the Cash Collateral Motion, the Debtors request an order: (i) authorizing the

use of PNC Bank, National Association's cash collateral pursuant to the Budget attached thereto

as Exhibit A; (ii) granting PNC Bank, National Association adequate protection in the form of

replacement liens pursuant to sections 361 and 363 of the Bankruptcy Code, to the extent PNC

Bank, National Association's cash collateral is used and to the extent of any diminution in the

value of PNC Bank National Association's collateral, with the same priority in the Debtors' post-

petition collateral, and proceeds thereof, that PNC Bank, National Association held in the

Debtors' prepetition collateral; and (iii) giving notice of and scheduling an interim and final

hearing pursuant to Bankruptcy Rule 4001.

14

48.     Without the immediate use of cash collateral, the Debtors will be unable to pay ordinary and necessary business expenses including, but not limited to, payroll and related obligations, utilities, amounts owed to vendors and other suppliers of goods and services, insurance, and other costs of administering the estates.  The use of cash collateral is therefore critical to preserving the value of the Debtors' estates for all parties-in-interest

### D.  The Bank Account Motion

49.     The Debtors seek entry of an order authorizing the Debtors to maintain current bank accounts, maintain prepetition cash management system, and use existing business forms, and granting a waiver of the deposit guidelines set forth in section 345 of the Bankruptcy Code.

50.     Prior to the Petition Date, as part of a centralized cash management system (the "Cash Management System"), the Debtors maintained bank accounts (the "Bank Accounts") with Wells Fargo, Provident Bank, New York Community Bank and PNC Bank (the "Banks").  The Debtors' Cash Management System and Bank Accounts enable the Debtors to control and monitor their funds, reduce administrative expense and monitor performance.

51.     The Debtors request that the Banks be: (a) authorized and directed to service and administer the Bank Accounts without interruption and in the usual and ordinary course, (b) prohibited from exercising any claimed rights of setoff or offset of amounts in such Bank Accounts including any right to administratively freeze such Bank Accounts, subject to further orders of this Court, (c) directed to receive, process, honor and pay all checks and drafts drawn on the Bank Accounts on account of any claim (as defined in 11 U.S.C. § 101(5)) arising on or after the Petition Date or any claim arising before the Petition Date that this Court has authorized to be paid, provided that sufficient funds, whether deposited prior or subsequent to the Petition Date, are in the Bank Accounts to cover and permit payment thereof, and (d) enjoined and

restrained from honoring any check issued on account of a claim arising prior to the Petition Date unless the Court authorizes payment of such claim and sufficient funds, whether deposited prior or subsequent to the Petition Date, are in the Bank Accounts to cover and permit payment thereof.  The Debtors seek authority to open new, debtors-in-possession bank accounts in the event that the Debtors determine that such new accounts are necessary or appropriate for the continued operation of the Debtors' business.

52.     Additionally, the Debtors use checks, contracts, correspondence, invoices, purchase orders and numerous other business forms in the ordinary course of their businesses.  A substantial amount of time and expense would be required in order to order, create or print new business forms. The Debtors therefore request authorization to continue to use their prepetition business forms, without reference to their status as a debtors-in-possession (other than post-petition checks, which shall bear either a "DIP" or "debtors-in-possession" designation); provided, however, that following the depletion of the Debtors' business stock, the Debtors will obtain new business forms reflecting their status as debtors-in-possession.

53.     Finally, the Debtors seek a waiver of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code to permit the Debtors to maintain their existing Bank Accounts even though their Bank Accounts, may, from time to time, exceed the amount insured by the FDIC.  The Debtors propose that the investment guideline waiver be granted on an interim basis only, and only the United States Trustee shall have sixty (60) days from the date of the entry of a court order authorizing such waiver to object to the waiver. If the U.S. Trustee does not file any such objection, the Debtors submit that the waiver of the investment guidelines shall be deemed final.

**E.  The Wage Motion**

3260220

54.     The continued and uninterrupted service of the Debtors' approximate seven-hundred (700) employees, including independent drivers (the "Employees"), largely comprising of truck drivers, delivery and warehouse personnel, is absolutely critical to the Debtors' continuing operations and a successful chapter 11 process.

55.     To minimize the personal hardship the Employees will suffer if Employee-related obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtors seek the authority, but not the obligation, to pay prepetition Employee claims for wages, salaries, compensation, benefits and reimbursable business expenses and other Employee-related costs, and to continue Employee programs with respect to vacation, sick, personal and holiday leave and similar benefit programs.

56.     In the ordinary course of business, the Employees are paid bi-weekly, *i.e.*, on every other Friday for the prior two-week period.[4]  The Debtors stagger their payroll, such that Employees in New York, New Jersey and California are paid one week ("Large Payroll"), and the Employees in other states (i.e., Washington, Illinois, Massachusetts, Virginia, Georgia, Tennessee, Texas, and Florida) are paid the following week ("Small Payroll").  As a result of the commencement of this case, certain Employees have accrued claims for wages and salaries (including vacation, sick pay and paid time off) that were earned prepetition, but which are payable post-petition (the "Accrued Wage and Salary Claims").  The Debtors estimate that the aggregate amount of the Accrued Wage and Salary Claims for paychecks is:

    (i)     a full Small Payroll, approximately $275,000.00, for the prepetition time period of December 26, 2016 through January 8, 2016, payable on January 15, 2016;

    (ii)    an estimated 3/4 of the Large Payroll, approximately $360,000.00, for the prepetition time period of January 4, 2016 through January 12, 2016, payable on

---

[4] Independent drivers are paid weekly.

January 22, 2016 (which the Debtor seeks to pay along with approximately $120,000.00 additional amounts for services rendered by Large Payroll Employees during the post-petition period of January 13, 2016 through January 15, 2016 covered by this payroll, which amounts will be paid in the ordinary course);

(iii)    an estimated 1/4 of the Small Payroll approximately $68,750, for the prepetition time period of January 9, 2016 through January 12, 2016, payable on January 29, 2016 (which the Debtor seeks to pay along with approximately $120,000.00 additional amounts for services rendered by Small Payroll Employees during the post-petition period of January 13, 2016 through January 22, 2016 covered by this payroll, which amounts will be paid in the ordinary course); and

(iv)    approximately $35,000, consisting of Accrued Wages and Salary Claims for the independent drivers.

57.    As described further in the Wage Motion, no Employee will receive more than the $12,475.00 cap set forth in section 507(a)(4) of the Bankruptcy Code on account of prepetition services.

## F. The Critical Vendor Motion

58.    Notwithstanding the Debtors' capacity to handle a multitude of shipping, delivery and courier for their clients with their own trucks and equipment, the Debtors also utilize the services of other trucking companies for specific geographical locations and for overflow work, i.e., when customer needs must be fulfilled but the Debtors' equipment and employees are 100% utilized.

59.    The Debtors have three (3) key trucking vendors that assist them with providing

18

services to their customers: (i) Kroger Logistics Inc.; (ii) Precise Logistics Inc.; and (iii) Universal Dynasty.  Each of these vendors (collectively, the "Critical Vendors") have claims for providing essential services that were rendered to, or on behalf of, the Debtors before the Petition Date (the "Critical Vendor Claims").  By the Critical Vendor Motion, the Debtors seek entry of an order authorizing the Debtors to pay certain prepetition claims of the Critical Vendors, which support the Debtors' ability to carry out their day-to-day operations.

60.     If the Critical Vendor Motion is not granted, the Debtors believe that the Critical Vendors will stop providing services to the Debtors on customary trade terms, effectively reducing the amount of trade credit available to the Debtors on a post-petition basis.  An interruption of the Debtors' normal operations may impair any chance for this case to be successful; indeed, even the mere threat of a shutdown could lead to disastrous consequences for the Debtors and their employees.  Payment of the Critical Vendor Claims will ensure that the Debtors are able to obtain necessary services, maintain their high levels of customer satisfaction and operate effectively in chapter 11 while they seek to reorganize.

### G. The Utilities Motion

61.     In the Utilities Motion, the Debtors seek entry of interim and final orders (i) prohibiting utility companies from discontinuing, altering or refusing service on account of prepetition invoices, (ii) deeming utility companies to have adequate assurance of future payment, and (iii) establishing procedures for resolving requests for additional assurance pursuant to sections 105(a) and 366 of the Bankruptcy Code.

62.     In the ordinary course of their businesses, the Debtors incur liabilities to the utility companies listed in the Utilities Motion (the "Utility Companies") for electricity, gas, telephone service, internet service, and data services.  Uninterrupted utility services are essential to the

19

continuation of the Debtors' operations and their ability to prosecute these chapter 11 cases. The Debtors' operations will be severely impacted if one or more of the Utility Companies refuse or discontinue utility services for even a brief period of time. Any interruption of utility services, to the extent that such interruption limits the Debtors' operations, will harm the Debtors' businesses and their ability to maximize the value of their assets in this proceeding. In addition, interruption of utility services may harm the Debtors' most profitable business relationships, which will be detrimental to the Debtors' estates, creditors and employees. Any disruption to the Debtors' operations as a result of termination of utility services will frustrate the Debtors' efforts in this case. Thus, it is critical that utility services provided to the Debtors continue uninterrupted.

63.     As of the Petition Date, the Debtors were current with some of the Utility Companies and had unpaid balances with others. The Debtors will remain current on all of their post-petition obligations to Utility Companies, and have included payments to the Utility Companies in the cash collateral budget presented to this Court that are equal to the Debtors' estimated aggregate cost for two (2) weeks of Utility Service from each respective Utility Company (the "Adequate Assurance Deposit"), calculated based upon the Debtors' average utility costs over the past twelve (12) months for each respective Utility Company, provided, however, that no deposit will be made on account of any Utility Company that is holding a pre-petition security deposit in an amount that is in excess of any pre-petition claim plus the estimated amount of the two (2) weeks' average utility costs. With respect to those entities that currently hold a security deposit in an amount in excess of their pre-petition claim plus the estimated amount of two (2) weeks' cost, each such Utility Company can continue to hold the balance of the existing deposit as adequate assurance of future payment. The Debtors propose to deposit this Adequate Assurance Deposit into a single, segregated, newly-created, interest-

3260220

bearing account (the "<u>Adequate Assurance Deposit Account</u>").

64.     In addition, the Debtors seek to establish reasonable procedures by which Utility Companies may request additional assurance of future performance, which are more thoroughly described in the Utilities Motion.

**H.  The Schedules Motion**

65.     The Debtors seek entry of an order pursuant Bankruptcy Rule 1007(c) extending for twenty-one (21) days the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "<u>Schedules</u>"). This case was filed under the gun on an emergent basis because of PNC Bank's insistence on attempting to seize the Debtors' major receivables. The Debtors' professionals have not had a fulsome opportunity to review and analyze all information and documents necessary to complete the Schedules.  Moreover, given the numerous tasks to which the Debtors and their professionals must attend to facilitate a smooth transition into chapter 11, the Debtors and their professionals are concerned that the Schedules may not be completed by the deadline established by Bankruptcy Rule 1007(c).  Rather than filing incomplete Schedules that would have to be amended at a later date, the Debtors seek a twenty-one (21) day extension of the fourteen (14)-day deadline provided by Rule 1007(c), which will provide the Debtors with a total of thirty-five (35) days after the Petition Date to file the Schedules.

**I.  The Porzio Motion**

66.     The Debtors seeks to retain Porzio, Bromberg & Newman, P.C. as their counsel.

## CONCLUSION

67.     The Orders granting the First Day Motions will enable the Debtors to stabilize and continue operating in the ordinary course while the Debtors seek to reorganize under the

21

Bankruptcy Code.    Accordingly, the Debtors respectfully request that the Court enter those

Orders.

      I hereby certify, under penalty of perjury, that the foregoing statements made by me are

true.


                        /s/Ajay Aggarwal
                        Ajay Aggarwal, President

Sworn and subscribed to
Before me this 13th day of
January, 2016

/s/Warren J. Martin Jr.
Warren J. Martin Jr.


An attorney-at-law of the State of New Jersey


22

3260220

# EXHIBIT A



January 5, 2016

**VIA OVERNIGHT AND FIRST CLASS MAIL**

Forever 21
Attn: Accounts Payable
3880 N. Mission Road
Room 3033
Los Angeles, CA 90031

Lisa S. Bonsall
Partner
T. 973-639-2066
F. 973-297-3849
lbonsall@mccarter.com

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4056
T. 973.622.4444
F. 973.624.7070
www.mccarter.com

BOSTON

HARTFORD

STAMFORD

NEW YORK

NEWARK

EAST BRUNSWICK

PHILADELPHIA

WILMINGTON

WASHINGTON, DC

# NOTICE OF PAYMENT INSTRUCTIONS

Re:     **Instructions for Payments Owed To E Z Mailing Services, Inc. d/b/a E Z Worldwide Express**

Dear Sir or Madam:

This Firm represents PNC Bank, National Association (the "Bank"). You are receiving this letter because you have been identified as an account debtor with outstanding amounts owing to **E Z Mailing Services, Inc. d/b/a/ E Z Worldwide Express** ("Borrower"). The Bank is enforcing its right to collect such amounts from Borrower's account debtors.

This letter confirms that the Bank has the legal right pursuant to its agreements with Borrower and applicable law to collect payment directly on Borrower's accounts. Pursuant to the terms of a Commercial Security Agreement (copy enclosed) and a filed Uniform Commercial Code financing statement (copy enclosed), the Bank has a perfected security interest in Borrower's accounts receivable. **The Bank is exercising its rights with respect to Borrower's accounts receivable and directing that all monies owed to Borrower be remitted directly to the Bank**.

**The Bank hereby demands that you pay to the Bank all amounts owed to Borrower**. Checks should be made payable to "E Z Mailing Services, Inc." and mailed to:

E Z Mailing Services, Inc.
c/o PNC Bank, National Association
<u>Attn</u>: Steve Chambers, VP
130 S. Bond Street
Bel Air, Maryland 21014

You will not receive credit for any payments that are not made in compliance with this letter. The Bank has not undertaken management for the business or

ME1 21765950v.1

Forever 21 Logistics (Returns – Merch.)
January 5, 2016
Page 2

operations of Borrower and has not assumed the responsibilities of Borrower under any contracts or agreements you might have with Borrower.

The Bank's receipt of any payment in an amount less than the full amount due shall not be construed as an accord and satisfaction or as an agreement to accept a lesser amount as payment in full of the amount due.  The Bank's acceptance of any endorsement or statement on any check evidencing a payment or a letter accompanying a payment shall not be deemed to be an accord and satisfaction, and the Bank may accept any such payment or check without prejudice to its right to receive the balance of the full amount due or to pursue its rights and remedies.

If you have any questions please contact Steve Chambers of PNC Bank, National Association at (410) 638-2237 or steven.chambers@pnc.com.   If your records indicate that there are no unpaid amounts due to Borrower, please write the Bank at the address set forth above enclosing copies of canceled checks or other evidence of payment.

Nothing contained herein is a waiver of any of the Bank's rights or remedies, and the Bank hereby reserves all of its rights and remedies.

Very truly yours,

Lisa S. Bonsall

Encl.

ME1 21765950v.1

*8100T*

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| 1,500,000.00 | 07-15-2013 | 06-30-2014 | | | 32984825 | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** E Z MAILING SERVICES INC.
669 Division Street
Elizabeth, NJ 07201

**Lender:** PNC Bank, National Association
Commercial Segment - BBL
Two Tower Center Boulevard
East Brunswick, NJ 08816

---

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means E Z MAILING SERVICES INC. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the New Jersey Industrial Site Recovery Act, NJSA Section 13:1K-6 ("ISRA"), the New Jersey Spill Compensation and Control Act, NJSA 58:10-23.11, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means E Z MAILING SERVICES INC..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note, including all principal and interest, together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. In addition, the word "Indebtedness" includes all other obligations, debts and liabilities, plus interest thereon, of Grantor, or any one or more of them, to Lender, as well as all claims by Lender against Grantor, or any one or more of them; whether now or hereafter existing, voluntary or involuntary, due or not due, direct or indirect, absolute or contingent, liquidated or unliquidated; whether Grantor may be liable individually or jointly with others; whether Grantor may be obligated as a guarantor, surety, accommodation party or otherwise; whether recovery upon such Indebtedness may be or hereafter may become barred by any statute of limitations; and whether such indebtedness may be or hereafter may become otherwise unenforceable.

**Lender.** The word "Lender" means PNC Bank, National Association, its successors and assigns.

**Note.** The word "Note" means the Note executed by Grantor in the principal amount of $1,500,000.00 dated July 15, 2013, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Uniform Commercial Code.** The words "Uniform Commercial Code" means the Uniform Commercial Code, as in effect from time to time, in the appropriate jurisdiction.

**THIS COMMERCIAL SECURITY AGREEMENT** dated July 15, 2013, is made and executed between E Z MAILING SERVICES INC. ("Grantor") and PNC Bank, National Association ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

The Collateral includes all assets of the Grantor, of every kind and nature, now existing and hereafter acquired and arising and wherever located, including without limitation, accounts (including health-care-insurance receivables and credit card receivables), deposit accounts, commercial tort claims, letter of credit rights, chattel paper (including electronic chattel paper), documents, instruments, investment

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

property, general intangibles (including payment intangibles), software, goods, inventory, equipment, furniture and fixtures, all supporting obligations of the foregoing, and all cash and noncash proceeds and products (including without limitation insurance proceeds) of the foregoing, and all additions and accessions thereto, substitutions therefor and replacements thereof

The word "Collateral" also includes all proceeds of the above described collateral, including without limitation, any equipment purchased with proceeds, as well as all accessories, attachments, accessions, replacements and additions, whether added now or later, together with all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, whether due to judgment, settlement or other process.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** Grantor hereby grants Lender a contractual security interest in and hereby assigns, conveys, delivers, pledges, and transfers all of Grantor's right, title and interest in and to Grantor's accounts with Lender (whether checking, savings, or some other account), including all accounts held jointly with someone else and all accounts Grantor may open in the future, excluding however, all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**OBLIGATIONS OF GRANTOR.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to execute financing statements and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper if not delivered to Lender for possession by Lender. Grantor hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue the security interest granted in this Agreement. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral. Grantor promptly will notify Lender before any change in Grantor's name including any change to the assumed business names of Grantor. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of New Jersey, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens

# COMMERCIAL SECURITY AGREEMENT
(Continued)

and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Collateral Schedules and Locations.** As often as Lender shall require, and insofar as the Collateral consists of accounts and general intangibles, Grantor shall deliver to Lender schedules of such Collateral, including such information as Lender may require, including without limitation names and addresses of account debtors and agings of accounts and general intangibles. Insofar as the Collateral consists of inventory and equipment, Grantor shall deliver to Lender, as often as Lender shall require, such lists, descriptions, and designations of such Collateral as Lender may require to identify the nature, extent, and location of such Collateral. Such information shall be submitted for Grantor and each of its subsidiaries or related companies.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor.. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A) be payable on demand;  (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

  **Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

  **Other Defaults.** Grantor or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

  **Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's or any Grantor's ability to repay the Indebtedness or perform their respective obligations under this Agreement or any of the Related Documents.

  **False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

  **Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any Related Documents to create a valid and perfected security interest or lien) at any time and for any reason.

  **Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

  **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

  **Events Affecting Guarantor.** Any of the preceding events occurs with respect to Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

  **Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

  **Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the New Jersey Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

  **Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

  **Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

  **Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness

## COMMERCIAL SECURITY AGREEMENT
(Continued)

Page 6

secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Leases and Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For those purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**AUTHORIZATION TO OBTAIN CREDIT REPORTS.** If the Grantor is/are an individual(s), by signing below, the undersigned individual(s), provides written authorization to Lender or its designee (and any assignee or potential assignee hereof) to obtain his/her/their personal credit profile(s) from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile(s) in considering any extension of credit to the Borrower or the Grantor and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By signature below, I/we affirm my/our identity as the respective individual/s identified in this Agreement.

**ADDITIONAL EVENT OF DEFAULT.** The following shall also be an event of default: Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**ADDITION TO DEFINITION OF "INDEBTEDNESS".** In addition to, and not in limitation of, the definition of the term "Indebtedness" found elsewhere in this document, the term "Indebtedness" shall include all obligations, debts and liabilities, plus interest thereon, of any Obligor (as defined below) to Lender, whether now existing or hereafter arising, whether related or unrelated to the purpose of this document, whether voluntary or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated and whether any Obligor may be liable individually or jointly with others, (i) under any interest or currency swap, future, option or other interest rate protection or similar agreement, (ii) under or by reason of any foreign currency transaction, forward, option or other similar transaction providing for the purchase of one currency in exchange for the sale of another currency, or in any other manner, (iii) arising by reason of an extension of credit, opening of a letter of credit, loan, equipment lease or guarantee; (iv) arising out of overdrafts on deposit or other accounts or out of electronic funds transfers (whether by wire transfer or through automated clearing houses or otherwise) or out of the return unpaid of, or other failure of Lender to receive final payment for, any check, item, instrument, payment order or other deposit or credit to a deposit or other account, or out of Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository or other similar arrangements. As used herein, the term "Obligor" means any Borrower, Guarantor, or Grantor, to the extent that such terms are defined in this document, or any other guarantor of, or any pledgor, mortgagor or other person or entity providing collateral support for, the Borrower's obligations to the Lender existing on the date of this document or arising in the future.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New Jersey without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of New Jersey.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Middlesex County, State of New Jersey.

**Multiple Parties.** All obligations of Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor. This means that each of the persons signing below is responsible for all obligations in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (a) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (c) to settle or compromise any and all claims arising under the Collateral, and, in the place and stead of Grantor, to execute and deliver its release and settlement for the claim; and (d) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Grantor, or otherwise, which in the discretion of Lender may seem to be necessary or advisable. This power is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

WAIVER OF JURY TRIAL. EACH OF GRANTOR AND LENDER IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY RELATED DOCUMENTS OR ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. GRANTOR AND LENDER ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JULY 15, 2013.

GRANTOR:

E Z MAILING SERVICES INC.

By: _____
Ajay Aggarwal, President of E Z MAILING SERVICES INC.

By: _____
Vijay Aggarwal, Vice President of E Z MAILING SERVICES INC.

LASER PRO Lending, Ver. 5.60.00.005 Copr. Harland Financial Solutions, Inc. 1997, 2013.   All Rights Reserved. - NJ  T:\CFI\LPL\E40.FC  TR-80127697  PR-14

*300*
*59*
*100*

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

2013 JUL 26 A 9 48

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company 1-866-484-2382

**B. E-MAIL CONTACT AT FILER (optional)**
SPRFiling@cscinfo.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

> 78372533 - 326840
> Corporation Service Company
> 801 Adlai Stevenson Drive
> Springfield, IL 62703
> Filed In: New Jersey
> (S.O.S.)

2641049-4

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME E Z MAILING SERVICES INC. | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 669 DIVISION STREET | CITY ELIZABETH | STATE NJ / POSTAL CODE 07201 | COUNTRY USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):** Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME PNC Bank, National Association | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 249 Fifth Ave Mailstop P1-POPP-LB-7 | CITY Pittsburgh | STATE PA / POSTAL CODE 15222 | COUNTRY USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
The Collateral includes all assets of the Debtor, of every kind and nature, now existing and hereafter acquired and arising and wherever located, including without limitation, accounts (including health-care-insurance receivables and credit card receivables), deposit accounts, commercial tort claims, letter of credit rights, chattel paper (including electronic chattel paper), documents, instruments, investment property, general intangibles (including payment intangibles), software, goods, inventory, equipment, furniture and fixtures, all supporting obligations of the foregoing, and all cash and noncash proceeds and products (including without limitation insurance proceeds) of the foregoing, and all additions and accessions thereto, substitutions therefor and replacements thereof.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
**6a.** Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility **6b.** Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing
**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
**8. OPTIONAL FILER REFERENCE DATA:** ACBS :TW

COPY

78372533

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Corporation Service Company
711 Centerville Rd, Ste. 400
Wilmington, DE 19808

# EXHIBIT B

| Batch Dated | Original Batch Amount | Current Batch Balance | Due Date | Over Due by (Days) | Notes |
|---|---|---|---|---|---|
| 12/14/2015 | $ 474,179.40 | $ 31,326.19 | 12/28/2015 | | Due on 12/28/2015 |
| 12/20/2015 | $ 598,901.95 | $ 598,901.95 | 1/4/2016 | | Due on 01/04/2016 |
| 12/27/2015 | $ 482,001.14 | $ 482,001.14 | 1/11/2016 | | Due on 01/11/2016 |
| 12/31/2015 | $ 479,003.72 | $ 479,003.72 | 1/15/2016 | | Due on 01/15/2016 |

**Total Balance:**        $        1,591,233.00

| Now Due | $        1,112,229.28 |
|---|---|
| Due on 01/15/16 | $        479,003.72 |